UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE NO.:

VANGUARD PLASTIC SURGERY, PLLC d/b/a
VANGUARD AESTHETIC AND PLASTIC
SURGERY,

      Plaintiff,

vs.


AETNA LIFE INSURANCE COMPANY,

      Defendants.

_____

## COMPLAINT AND DEMAND FOR JURY TRIAL

### Introduction

Plaintiff Vanguard Plastic Surgery, PLLC d/b/a Vanguard Aesthetic & Plastic Surgery ("Plaintiff"), a Florida corporation, sues Defendants Aetna Life Insurance Company ("Aetna" or "Defendant"), and alleges as follows:

1.    This action concerns the unreasonably low rate at which Defendant reimbursed Plaintiff for medical services Plaintiff provided to the following patients covered under a health insurance plan insured, operated, and/or administered by Defendant: L.B.; B.H.; R.M.; R.S. (collectively "Patients").

2.    Plaintiff provided medically necessary services to Patients consisting of different complex surgical procedures.

3.    The relevant surgeries were pre-authorized by Defendant.

4.    Plaintiff performed all surgeries with the understanding and expectation that Defendant would reimburse Plaintiff for the services it provided to Patients at billed charges, rates equal to the fair market and/or the reasonable value of Plaintiff's services. Plaintiff's understanding and expectation in this regard was based upon Defendant's preauthorization of the services, Defendant's representations on the remittance documents it sent to Plaintiff, the course of dealing and course of performance between Defendant and Plaintiff, and the requirements of Florida law.

5.    Instead, Defendant has wrongfully paid Plaintiff at rates below: (1) the "usual and customary provider charges" in violation of Section 641.513(5), Florida Statutes, for claims subject to those sections; and/or (2) the reasonable value of the services in the marketplace required under *quantum meruit* by the implied-in-fact contract and/or the implied-in-law contract between the parties; and/or (3) below the billed charges expected to be paid.

6.    Florida has a strong public policy of protecting both patients who receive medical services in Florida and physicians who provide medical services in Florida.

7.    Section 641.513(5) furthers Florida's public policy by protecting members of managed care organizations from being balance billed for services subject to these statutes, and by protecting non-participating providers who provide services subject to these statutes from being unfairly or inadequately compensated for services they are legally required to perform.

8.    Under Section 641.513(5), Defendant is obligated to pay Plaintiff, on claims subject to those sections, the lesser of Plaintiff's billed charges and the "usual and customary provider charges for similar services in the community where the services were provided"; i.e., the fair market value of the services, as interpreted by Florida courts.

9.      For claims not subject to Section 641.513(5), Defendant is obligated to pay Plaintiff under their implied contracts and the doctrine of *quantum meruit* the lesser of Plaintiff's billed charges or, if different, the reasonable value of the services Plaintiff's physicians rendered to Defendant's members.

10.      Defendant has already adjudicated these claims and determined that all of the claims at issue in this action were for covered services rendered to Patient, and Defendant has already paid all of the claims at issue, albeit at amounts representing a mere fraction of the applicable shared savings rates for the services, the "usual and customary provider charges" for the services, and/or the reasonable value of the services. Thus, this action concerns only the *rate of* payment and not the *right to* payment. This action does not include any claims in which benefits were denied, nor does it challenge any coverage determinations under ERISA. Furthermore, Defendant, as an out-of-network provider, does not seek payment under the plan.

11.      In this action, Plaintiff is seeking to have Defendant comply with their obligation to pay Plaintiff at the rates that represent the "usual and customary provider charges" required by Section 641.513(5), and/or the reasonable value of Plaintiffs services in the marketplace required under *quantum meruit* based on their implied-in-fact and/or implied-in-law contracts.

12.      For the claims at issue in this action, the conduct and relationship of Plaintiff and Defendant and the surrounding circumstances created an enforceable contract in law and in fact, as well as a statutory right. Further, Plaintiff did not agree to accept discounted rates from Defendant for its services and did not agree to be bound by the terms of Patient's plan or by Defendant's reimbursement policies or rate schedules. Nevertheless, Defendant has not paid Plaintiff the usual and customary provider charges under Section 641.513(5), Florida Statutes, fair market or reasonable value of its services and/or the billed charges.

13.     The impact of Defendant's underpayments on the claims at issue is considerable and has left a balance due from Defendant exceeding the minimum jurisdictional limits of this Court.

**Parties**

14.     Plaintiff is a Florida professional limited liability company with its principal place of business located in Broward County, Florida.

15.     Defendant is a foreign for-profit corporation registered to do business in the state of Florida. At all material times, Defendant was a health insurer and/or health claims administrator actively engaged in the transaction of health insurance servicing in the state of Florida and providing managed healthcare products and administrative services throughout Florida, including in Broward County, Florida.

**Jurisdiction and Venue**

16.     The amount in controversy exceeds the sum of $30,000, exclusive of interest, costs, and attorneys' fees.

17.     Defendant operates, conducts, engages in, and carries on business in the state of Florida and has offices and agencies throughout the state of Florida.

18.     As Defendant is a foreign for-profit corporation, this Court has jurisdiction pursuant to diversity jurisdiction.

19.     Venue is proper in Broward County, Florida, because the Plaintiff provided the medical services at issue to the Patient in Broward County and because the payments to Plaintiff for those services were due in Broward County.

## Facts

### *General Facts*

20.     Plaintiff, through its physicians, provides medical services, including emergency services and care, reconstructive services, and other surgical services to patients in Broward County, Florida, including at Plantation General Hospital[1], located in Plantation, Florida.

21.     Plaintiff's physicians are licensed medical doctors practicing in the state of Florida.

22.     Plaintiff's physicians specialize in complex reconstructive surgery, including flap procedures, tissue transfers, skin grafts, and other procedures that allow for complex repair of human tissue after traumatic injuries.

23.     Furthermore, Plaintiff's Physicians are bound by their professional ethics and the medical standard of care to not only render emergency treatment, but also provide continuity of care in the interest of the patient.

24.     Defendant provides coverage for healthcare services provided to members of its managed healthcare products in the state of Florida.

25.     In exchange for premiums, fees, and/or other forms of compensation, Defendant agrees to administer claims and provide reimbursement for healthcare services rendered to members of its health insurance policies.

26.     Furthermore, Defendant agrees to maintain a network of qualified physicians. By failing to do so, as was the case with each patient here, Defendant essentially made each patient a self-pay patient, in breach of its obligations to both the providers and patients.

---

[1] Plantation General Hospital has since been purchased and now operates as HCA University Hospital.

27.     Defendant failed to maintain a network that included providers qualified to perform procedures and medical services which are covered under the plan, specifically those services authorized on behalf of Patients L.B., B.H. and R.M.

*Patient's Health Insurance Policy*

28.     At all material times, Patients were a member of a group health insurance policy for Broward County Schools issued, fully insured, and administered by Defendant, a health maintenance organization ("HMO"), which policy provided coverage for services received by Patient and provided in the state of Florida (the "Policy").

*Relevant Statutes*

29.     Section 641.513(5), Florida Statutes, provides as follows:

Reimbursement for services pursuant to this section by a provider who does not have a contract with the health maintenance organization shall be the lesser of:

(a)   The provider's charges;

(b)   The usual and customary provider charges for similar services in the community where the services were provided; or

(c)   The charge mutually agreed to by the health maintenance organization and the provider within 60 days of the submittal of the claim.

Such reimbursement shall be net of any applicable copayment authorized pursuant to subsection (4).

30.     Florida courts have interpreted the phrase "usual and customary provider charges for similar services in the community where the services were provided" under Section 641.513(5) to require payment of "fair market value" for the services rendered. *Baker Cnty. Med. Servs. v. Aetna Health Mgmt., LLC,* 31 So. 3d 842,845–46 (Fla. 1st DCA 2010).

31.     Additionally, breast reconstruction is a federal mandate under the Women's Health and Cancer Rights Act ("WHCRA"), enacted in 1998, which requires group health plans to cover and reimburse breast reconstruction after a mastectomy. This law, codified at 29 U.S.C. § 1185b, states:

> (a) **In general.** A group health plan . . . shall provide, in case of a participant or beneficiary who is receiving benefits in connection with a mastectomy and who elects breast reconstruction in connection with such mastectomy, coverage for –
>
>> (1) all stages of reconstruction of the breast on which mastectomy has been performed . . . in a manner determined in consultation with the attending physician and the patient. Such coverage may be subject to annual deductibles and coinsurance provisions as may be deemed appropriate and as are consistent with those established for other benefits under the plan or coverage . . .
>
> (c)     **Prohibitions.** A group health plan, and a health insurance issuer offering group health insurance coverage in connection with a group health plan, may not –
>
>> (2) penalize or otherwise reduce or limit the reimbursement of an attending provider,
>
> (d)     **Rule of construction.** Nothing in this section shall be construed to prevent a group health plan or a health insurance issuer offering group health insurance coverage from negotiating the level and type of reimbursement with a provider for care provided in accordance with this section.

32.     The structure of this statute is straightforward. 29 U.S.C. § 1185b(a) requires that post-mastectomy breast reconstruction surgery be *covered*. 29 U.S.C. § 1185b(c) prohibits any restrictions or limitations on the *reimbursement rate* for this type of surgery, whether performed by an in-network surgeon or an out-of-network surgeon, as compared to other types of surgery where a plan or insurer may reimburse based on an out-of-network reimbursement methodology

(such as "MRC"). However, 29 U.S.C. § 1185b(d), provides an exception to the strict requirement of 29 U.S.C. § 1185b(c): the plan or insurer may negotiate a lower reimbursement amount with the provider.

33.     With respect to Aetna's representation that "Per legislation governing this program, payment constitutes payment in full," the WHCRA does not state that an insurer's payment "constitutes payment in full." The WHCRA states the opposite.

### A. *Patient L.B.*

34.     Plaintiff provided medically necessary services to Patient L.B. consisting of four different complex surgical procedures relating to Patient L.B.'s diagnosis of cancer in the left breast. These surgical procedures included a bilateral mastectomy, multiple stages of reconstruction, and other procedures necessary to treat infections and other physical complications from which Patient L.B. was suffering as a result of the bilateral mastectomy. Three of the surgeries at issue were pre authorized by the Defendant. One of the surgeries was performed on an emergency basis.

*Patient L.B.'s First Surgery - June 11, 2020*

35.     On or about June 11, 2020, Patient L.B. presented to Plantation General Hospital for pre-authorized bilateral mastectomies and staged tissue expander reconstruction.

36.     On or about June 11, 2020, Plaintiff, through its physician, Dr. Weinstein performed the bilateral mastectomies. Immediately thereafter, Plaintiff's physician, Dr. Ranganath, performed staged tissue expander reconstruction, which are covered benefits under Patient L.B.'s plan ("Patient L.B.'s First Surgery").

37.     While Dr. Ranganath was out-of-network at all material times, Defendant recognized that its network did not have in-network providers with the skill and experience to

perform the above procedures. Therefore, Defendant granted Plaintiff an in-network exception, which applied to all continuing care by the provider. By granting the in-network exception, Defendant promised the patient that they will be held only to their in-network cost sharing obligation and that they are "assuming" the obligation of the balance bill. Thus, Defendant effectively assumed responsibility for Plaintiffs' billed charges. By granting the in-network exception to the out-of-network provider Plaintiff, they are in essence contracting with him. **(See In Network Exception Agreement – Attached herein as Exhibit "A").**

38.     This is a particularly complex procedure and Plantation General Hospital is an in-network facility.

*Patient L.B.'s Second Surgery - February 10, 2021*

39.     On or about February 10, 2021, Patient L.B. presented to Plantation General Hospital for pre-authorized bilateral mastectomies and breast reconstruction.

40.     Aetna issued prior authorization for the February 10, 2021 medically necessary services under prior authorization number 1720246110000000.

41.     On or about February 2, 2021, Plaintiff, through its physician, Drs. Fletcher and Dreszer, provided medical services to Patient L.B. at Plantation General Hospital, which consisted of breast reconstruction using Deep Inferior Epigastric Perforator (DIEP) Flaps and bilateral breast scar revision due to a diagnosis of cancer of the left breast, which were covered benefits under Patient L.B.'s Plan ("Patient L.B.'s Second Surgery").

42.     A DIEP Flap is a cutting-edge breast reconstruction procedure that uses a flap of complete tissue, blood vessels, skin and fat from the woman's lower abdomen as donor tissue. The flap is then transplanted to the chest where those removed blood vessels are reconnected to the vessels in the chest. The flap is then shaped into a new breast and the abdomen is surgically closed.

The procedure requires two micro-surgeons and at times, both a first and second assist, working together in unison for approximately 8-12 hours. There are few surgeons with proper training and skill to perform this complex procedure.

43.     Dr. Fletcher assisted Dr. Dreszer for Patient L.B.'s Second Surgery.

44.     Aetna entered into an agreement with Vanguard by which it granted Vanguard an In-Network Exception. In the letter from Aetna dated February 2, 2021, Aetna both represented and promised that the "service is approved at an in-network benefit level." The member will be responsible only for in-network cost-sharing requirements. The provider identified to provide this service does not participate with this plan." The letter further noted that all three components of the coverage approval process had been satisfied: verification of the member's eligibility for coverage, verification that the member had coverage for the service, and verification that the approved service was medically necessary.

45.     This letter was an In-Network Exception Agreement. More than just a verification of benefits, it formed a promise that Defendant Aetna would provide payment at the "in network benefit level" for the surgeries, which meant that the insured would not be liable for out-of-network patient cost-sharing amounts such as deductibles, co-payments, co-insurance, and the balance of the bill. It was also a representation that Defendant would provide such a benefit or assume any financial obligation above the patient's in-network obligation.

46.     While Drs. Fletcher and Dreszer were out-of-network at all material times, Aetna recognized that its network did not have in-network providers with the skill and experience to perform the required procedure. Therefore, Aetna granted Plaintiff an in-network GAP exception, in a letter dated February 2, 2021, which applied to all continuing care by the provider.

47.     After Drs. Dreszer and Fletcher performed the two pre-authorized breast reconstruction and/or revision surgeries, Aetna breached the In-Network Exception Agreement.

The in-network benefit level Defendant both represented and promised precluded out-of-network patient cost-sharing requirements, including charges that exceeded the out-of-network fee schedule ("balance bill"). Instead, Aetna reimbursed Vanguard based on what it said was the "maximum allowable" amount, for which it is usual and customary to receive payment-in-full or the maximum amount a plan will pay for a covered health care service for out-of-network providers. In-network providers, on the other hand, are paid based on a mutually negotiated contract rate between the insurance payor and the provider. Yet, Aetna reimbursed Plaintiff at unilaterally determined rates. In one Explanation of Benefit ("EOB") sent to Plaintiff, Aetna stated that its payment was based on a self-invented methodology it called "reasonable and appropriate." None of this constituted the value Defendant Aetna represented and promised, because the patient was left to pay the difference between the Plaintiff's charges and Aetna's "maximum allowable" amount.

48.    Upon information and belief, Drs. Dreszer and Fletcher are two of the only physicians in the geographic area who are qualified to perform this procedure at Plantation General Hospital. Plantation General Hospital is an in-network facility.

*Patient L.B.'s Emergency Third Surgery - February 12, 2021*

49.    On February 12, 2021, Patient L.B. returned to the operating room at Plantation General Hospital, at which time Dr. Dreszer performed a bilateral exploration and revision of reconstructed breasts as a result of Patient L.B.'s developing of hematoma plus venus and arterial thrombosis of her deep inferior epigastric perforator flap, which was also a covered benefit under Patient L.B.'s Plan ("Patient L.B.'s Emergency Third Surgery"). Thrombosis is a condition which requires immediate medical attention. Without immediate attention, Patient L.B.'s health can be put in serious jeopardy, potentially leading to serious impairment to Patient L.B.'s bodily functions, and/or serious dysfunction of Patient L.B.'s bodily organ(s) or part(s).

50.     The medical services rendered by Drs. Fletcher and Dreszer on February 12, 2021 constitute inadvertent and/or continuity of care stemming from the first two procedures, which Drs. Fletcher and Dreszer's professional ethics require him to provide in the best interest of the patient and which was covered as continuity of care when applying an in-network exception.

51.     On February 12, 2021, Plaintiff, through its physicians, provided a continuation of treatment and/or inadvertent care required to address emergent conditions, as defined in F.S. 641.47, stemming from Patient L.B.'s First Surgery on April 3, 2019.

*Patient L.B.'s Fourth Surgery - August 20, 2021*

52.     On or about August 20, 2021, Patient L.B. presented to Plantation General Hospital for continuous treatment of her left breast cancer diagnosis and corresponding bilateral mastectomies and breast reconstruction procedures.

53.     Aetna issued prior authorization for the August 20, 2021 medically necessary services under prior authorization number 8180928110000000.

54.     On August 20, 2021, Dr. Fletcher performed breast reconstruction and revision surgery with fat grafting from Patient L.B.'s abdomen ("Patient L.B.'s Fourth Surgery").

55.     The medical services rendered by Drs. Fletcher on August 20, 2021 constitute continuity of care stemming from Patient L.B.'s earlier procedures, which was covered as continuity of care when applying an in-network exception.

56.     While Drs. Fletcher was out-of-network at all material times, Aetna recognized that its network did not have in-network providers with the skill and experience to perform the required procedure. Therefore, Aetna granted Plaintiff an in-network GAP exception, in a letter dated February 2, 2021, which applied to all continuing care by the provider, including Patient L.B.'s Fourth Surgery.

57.     After Dr. Fletcher performed the two pre-authorized breast reconstruction and/or revision surgeries, Aetna breached the In-Network Exception Agreement. The in-network benefit level Defendant both represented and promised precluded out-of-network patient cost-sharing requirements, including charges that exceeded the out-of-network fee schedule ("balance bill"). Instead, Aetna did not reimburse Vanguard for Patient L.B.'s Fourth Surgery. In-network providers, on the other hand, are paid based on a mutually negotiated contract rate between the insurance payor and the provider. None of this constituted the value Defendant Aetna represented and promised, because the patient was left to pay the difference between the Plaintiff's charges and Aetna's "maximum allowable" amount.

### *Defendant's Underpayment of Patient L.B. Claims*

58.     Plaintiff submitted claims for reimbursement for the services Plaintiff provided to Patient L.B. as part of L.B.'s Surgeries (collectively, the "Patient B.H. Claims").

59.     Plaintiff submitted Patient L.B. Claims to Defendant as the designated claims administrator responsible for adjudicating Patient L.B. Claims on behalf of Patient L.B.'s policy.

60.     Plaintiff's charges for the services it provided as part of Patient L.B.'s First Surgery totaled $122,975.00, of which Aetna paid $2,594.96.

61.     Plaintiff's charges for the services it provided as part of Patient L.B.'s Second Surgery totaled $331,722.00, of which Aetna paid $3,058.23.

62.     Plaintiff's charges for the services it provided as part of Patient L.B.'s Emergency Third Surgery totaled $203,510.00, of which Aetna paid $1,690.48.

63.     Plaintiff's charges for the services it provided as part of Patient L.B.'s Fourth Surgery totaled $51,483.00, of which Aetna paid $0.00.

64.     Thus, Plaintiff's charges for the services underlying Patient L.B. Claims totaled $709,690.00.

65.     Defendant paid Plaintiff a total of $7,343.67 on Patient L.B. Claims, which is a mere 1% of Plaintiff's charges for the services at issue and nowhere near the amount Defendant is required to pay to Plaintiff.

66.     Defendant issued the remittance notices of its foregoing underpayments on Patient L.B.'s Claims to Plaintiff in Fort Lauderdale, Florida.

67.     Plaintiff never agreed to accept discounted rates from Defendant or to be bound by Defendant's reimbursement policies or rate schedules with respect to Patient L.B. Claims.

68.     Plaintiff justifiably relied on the terms included in the In-Network Exception Agreement. The In-Network Exception Agreement was addressed to the Plaintiff, provided terms for payment and identified the specific physician and CPT codes which were the services in essence being contracted for.

69.     Additionally, Defendant's course of dealing and course of performance with Plaintiff was to administer claims for services based on 80% of the Fair Health rate when a payment amount could not be determined by the In-Network Exception Agreement. **(See attached letters establishing Defendant's course of conduct related to non-party patients – attached herein as Exhibit "B").**

70.     Plaintiff's course of dealing and course of performance with Defendant consistently demonstrates that Defendant pays Plaintiff 80% of the Fair Health amount for the CPT codes billed, particularly when their network does not include physicians with adequate experience or skill level to perform a medically necessary procedure. *Baker Cnty. Med. Servs. v. Aetna Health Mgmt., LLC,* 31 So. 3d 842,845–46 (Fla. 1st DCA 2010).

71.     Defendant already adjudicated Patient L.B. Claims and determined they were for covered services under the Policy.

72.     Defendant has at all material times acknowledged and approved Plaintiff's rendering of the medical services underlying Patient L.B. Claims, including by pre authorizing Plaintiff's provision of services to Patient as part of the Patient L.B's surgeries, as corroborated through an In-Network Exception Agreement, and, upon information and belief, by authorizing Patient L.B.'s admission to Plantation General Hospital on or about June 11, 2020 and thereafter on February 10, 2021, and continued treatment of the Plaintiff's medical condition for which she presented for on February 12, 2021 and August 20, 2021.

73.     Defendant was and is aware that Plaintiff provided medical services to Patient L.B. and billed Defendant for the medical services Plaintiff's physicians provided to Patient L.B. with the expectation and understanding that its services had been approved by Defendant and that it would be reimbursed by Defendant at rates reflecting the "in-network benefit level" including but not limited to 80% of the Fair Health rate, the billed charges/reasonable value in the marketplace, or *quantum meruit,* of the medical services Plaintiff provided.

74.     Defendant in fact determined Plaintiff's medical services were covered services and paid Plaintiff for the medical services it provided to Patient L.B., albeit at rates inappropriately below Plaintiff's billed charges and the reasonable value in the marketplace.

75.     The rates at which Defendant paid Patient L.B. Claims are significantly less than the billed charges and the reasonable value of the services in the marketplace. Furthermore, the rates paid by Defendant for Patient L.B.'s claims are not reflective of the "in-network benefit level" including but not limited to the 80% Fair Health rate promised by nature of entering into the In-Network Exception Agreement.

76. Defendant's refusal to pay Plaintiff the billed charges and/or reasonable value of the medical services Plaintiff provided to Patient L.B. has caused Plaintiff to suffer damages in an amount equal to the difference between the amounts Defendant paid on Patient L.B. Claims and the reasonable value of the services Plaintiff provided, plus Plaintiff's loss of use of that money. The difference between the amounts Defendant paid and Plaintiff's billed charges totals **$702,346.33**.

77. All necessary conditions precedent for Defendant to perform its obligations pursuant to the applicable express contracts between the parties occurred or were performed, excused, and/or waived.

### B. *Patient B.H.*

78. Plaintiff provided medically necessary services to Patient B.H. consisting of two different complex surgical procedures relating to Patient B.H.'s recovery from breast cancer. These surgical procedures included a bilateral breast scar revision, abdominal symptomatic scar revision, liposuction of the lateral breasts as well as fat grafting to correct symmetry. Additionally, Patient B.H. required a bilateral breast reconstruction for contour deformities. Both surgeries performed by Plaintiff were pre-authorized by Defendant.

79. Aetna recognized that it lacked an adequate network of providers with the skill and experience to perform the required procedures. As such, Aetna entered into an agreement with Vanguard by which it granted Vanguard an In-Network Exception Agreement for both breast reconstruction surgeries. In the letter from Aetna dated March 14, 2019, Aetna both represented and promised that the "service is approved at an in-network benefit level." The member will be responsible only for in-network cost-sharing requirements. The provider identified to provide this service does not participate with this plan." The letter further noted that all three components of the coverage approval process had been satisfied: verification of the

member's eligibility for coverage, verification that the member had coverage for the service, and verification that the approved service was medically necessary.

80.     This letter was an In-Network Exception Agreement. More than just a verification of benefits, it formed a promise that Defendant Aetna would provide payment at the "in network benefit level" for the surgeries, which meant that the insured would not be liable for out-of-network patient cost-sharing amounts such as deductibles, co-payments, co-insurance, and the balance of the bill. By granting the in-network exception, Defendant promised the patient that they will be held only to their in-network cost sharing obligation and that they are "assuming" the obligation of the balance bill. Thus, Defendant effectively assumed responsibility for Plaintiffs' billed charges. By granting the in-network exception to the out-of-network provider Plaintiff, they are in essence contracting with him. **(See In Network Exception Agreement – Attached herein as Exhibit "C").**

81.     After Drs. Dreszer and Fletcher performed the two pre-authorized breast reconstruction and/or revision surgeries, Aetna breached the In-Network Exception Agreement. The in-network benefit level Defendant both represented and promised precluded out-of-network patient cost-sharing requirements, including charges that exceeded the out-of-network fee schedule ("balance bill"). Instead, Aetna reimbursed Vanguard based on what it said was the "maximum allowable" amount, for which it is usual and customary to receive payment-in-full or the maximum amount a plan will pay for a covered health care service for out-of-network providers. In-network providers, on the other hand, are paid based on a mutually negotiated contract rate between the insurance payor and the provider. Yet, Aetna reimbursed Plaintiff at unilaterally determined rates. In one Explanation of Benefit ("EOB") sent to Plaintiff, Aetna stated that its payment was based on a self-invented methodology it called "reasonable and appropriate." None of this constituted the value Defendant Aetna represented and promised,

because the patient was left to pay the difference between the Plaintiff's charges and Aetna's "maximum allowable" amount.

*Patient B.H.'s First Surgery – March 26, 2018*

82.     On or about March 26, 2018, Patient B.H. presented to Plantation General Hospital for a pre-authorized bilateral breast scar revision, abdominal symptomatic scar revision, liposuction of the lateral breasts as well as fat grafting to correct symmetry.

83.     Aetna issued prior authorization for the March 26, 2018 medically necessary services under prior authorization number 311198401.

84.     On or about March 26, 2018, Plaintiff, through its physician, Drs. Fletcher and Dreszer, provided medical services to Patient B.H. at Plantation General Hospital, which consisted of bilateral breast scar revision, abdominal symptomatic scar revision, liposuction of the lateral breasts as well as fat grafting to correct symmetry due to a prior diagnosis of breast cancer, all of which were covered benefits under Patient B.H.'s Plan ("Patient B.H.'s First Surgery").

85.     While Drs. Fletcher and Dreszer were out-of-network at all material times, Aetna recognized that its network did not have in-network providers with the skill and experience to perform the required procedure. Therefore, Aetna granted Plaintiff an in-network GAP exception, in a letter dated March 14, 2018, which applied to all continuing care by the provider.

86.     Upon information and belief, Drs. Dreszer and Fletcher are two of the only physicians in the geographic area who are qualified to perform this procedure at Plantation General Hospital. Plantation General Hospital is an in-network facility.

*Patient B.H.'s Second Surgery – March 28, 2019*

87.     On March 28, 2019, Patient B.H. presented at Surgery Center of Fort Lauderdale, at which time Dr. Dreszer performed a bilateral reconstruction of breasts with contour

deformities, which was also a covered benefit under Patient B.H.'s Plan ("Patient B.H.'s Second Surgery").

88.     The medical services rendered by Dr. Dreszer on March 28, 2019 constitutes continuity of care stemming from the first procedure, which Dr. Dreszer's professional ethics require him to provide in the best interest of the patient and which was covered as continuity of care when applying an in-network exception.

89.     On March 28, 2019, Plaintiff, through its physicians, provided a continuation of treatment, as defined in F.S. 641.47, stemming from Patient B.H.'s First Surgery on March 26, 2019.

### *Defendant's Underpayment of Patient B.H. Claims*

90.     Plaintiff submitted claims for reimbursement for the services Plaintiff provided to Patient B.H. as part of B.H.'s Surgeries (collectively, the "Patient B.H. Claims").

91.     Plaintiff submitted Patient B.H. Claims to Defendant as the designated claims administrator responsible for adjudicating Patient B.H. Claims on behalf of Patient B.H.'s policy.

92.     Plaintiff's charges for the services it provided as part of Patient B.H.'s First Surgery totaled $17,791, of which Aetna paid $1,024.85.

93.     Plaintiff's charges for the services it provided as part of Patient B.H.'s Second Surgery totaled $49,048, of which Aetna paid $1,204.53 for his services.

94.     Thus, Plaintiff's charges for the services underlying Patient B.H. Claims totaled $66,839.

95.     Defendant paid Plaintiff a total of $3,448.58 on Patient B.H. Claims, which is a mere 5% of Plaintiff's charges for the services at issue and nowhere near the amount Defendant is required to pay to Plaintiff.

96.     Defendant issued the remittance notices of its foregoing underpayments on Patient B.H.'s Claims to Plaintiff in Fort Lauderdale, Florida.

97.     Plaintiff never agreed to accept discounted rates from Defendant or to be bound by Defendant's reimbursement policies or rate schedules with respect to Patient B.H. Claims. Despite this, AETNA issued a misleading Explanation of Benefits for Plaintiff's Claims citing payment at a percentage of "the negotiated rate" - yet no rate was negotiated between Plaintiff and AETNA.

98.     Upon information and belief, Defendant's course of dealing and course of performance with Plaintiff was to administer claims for services, including emergency care, continuation of care and/or inadvertent services, based on the reasonable value of the services and/or billed charges.

99.     The amounts Defendant paid to Plaintiff for the services underlying Patient B.H. Claims for all three surgeries do not correspond with the statutory language mandated under Florida law.

100.    Defendant already adjudicated Patient B.H. Claims and determined they were for covered services under the Policy.

101.    Defendant has at all material times acknowledged and approved Plaintiff's rendering of the medical services underlying Patient B.H. Claims, including by pre authorizing Plaintiff's provision of services to Patient as part of the Patient B.H First and Second surgeries, as corroborated through an In-Network Exception Agreement, and, upon information and belief, by authorizing Patient B.H's admission to Plantation General Hospital on or about February 10, 2021, February 12, 2021 and August 20, 2021 for the treatment of Patient B.H.,'s emergency medical conditions and/or continued treatment.

102.    Plaintiff justifiably relied on the terms included in the In-Network Exception Agreement. The In-Network Exception Agreement was addressed to the Plaintiff, provided terms for payment and identified the specific physician and CPT codes which were the services in essence being contracted for.

103.    Additionally, Defendant's course of dealing and course of performance with Plaintiff was to administer claims for services based on 80% of the Fair Health rate when a payment amount could not be determined by the In-Network Exception Agreement. **(See attached letters establishing Defendant's course of conduct related to non-party patients – attached herein as Exhibit "B").**

104.    Plaintiff's course of dealing and course of performance with Defendant consistently demonstrates that Defendant pays Plaintiff 80% of the Fair Health amount for the CPT codes billed, particularly when their network does not include physicians with adequate experience or skill level to perform a medically necessary procedure. *Baker Cnty. Med. Servs. v. Aetna Health Mgmt., LLC,* 31 So. 3d 842,845–46 (Fla. 1st DCA 2010).

105.    Defendant was and is aware that Plaintiff provided medical services to Patient B.H. and billed Defendant for the medical services Plaintiff's physicians provided to Patient B.H. with the expectation and understanding that its services had been approved by Defendant and that it would be reimbursed by Defendant at rates reflecting  (a) lesser of (i) Plaintiff's billed charges or (ii) the "usual and customary provider charges for similar services" (i.e., fair market value), as provided by Section 641.513(5), for claims subject to this section, and/or (b) the reasonable value in the marketplace, or *quantum meruit,* of the medical services Plaintiff provided, for claims determined to be not subject to Section 641.513(5).

106.    Defendant in fact determined Plaintiff's medical services were covered services and paid Plaintiff for the medical services it provided to Patient B.H., albeit at rates inappropriately

below Plaintiff's billed charges, the fair market value, and the usual and customary rates for Plaintiff's services in the marketplace. Furthermore, the rates paid by Defendant for Patient L.B.'s claims are not reflective of the "in-network benefit level" including but not limited to 80% of the Fair Health rate promised by nature of entering into the In-Network Exception Agreement.

107.    The rates at which Defendant paid Patient B.H.'s Claims are significantly less than the rates required by Florida law. For claims covered by Section 641.513(5), Defendant has not paid Plaintiff the lesser of its billed charges or the fair market value of the services provided. For claims not covered by those sections, Defendant has not paid Plaintiff the usual and customary rates for the services or the reasonable value of the services in the marketplace.

108.    Defendant's refusal to pay Plaintiff the billed charges and/or reasonable value of the medical services Plaintiff provided to Patient B.H. has caused Plaintiff to suffer damages in an amount equal to the difference between the amounts Defendant paid on Patient B.H. Claims and the reasonable value of the services Plaintiff provided, plus Plaintiff's loss of use of that money. The difference between the amounts Defendant paid and Plaintiff's billed charges totals **$632,390.42**.

109.    All necessary conditions precedent for Defendant to perform its obligations pursuant to the applicable express contracts between the parties occurred or were performed, excused, and/or waived.

### C.  *Patient R.M.*

110.    Plaintiff provided medically necessary services to Patient R.M. relating breast reconstruction following a mastectomy due to Patient R.M.'s diagnosis of right breast cancer. The surgical procedure included a breast implant exchange.

111.    The follow-up surgery performed by Plaintiff was pre-authorized by Defendant. Aetna entered into an agreement with Vanguard by which it granted Vanguard an In-Network Exception Agreement for the implant exchange procedure, which also constituted continuity of care from Patient's initial, preauthorized breast reconstruction and mastectomy procedures. In the letter from Aetna dated May 21, 2018, Aetna both represented and promised that the "Service is approved at an in-network benefit level". The member will be responsible only for in-network cost-sharing requirements. The provider identified to provide this service does not participate with this plan." The letter further noted that all three components of the coverage approval process had been satisfied: verification of the member's eligibility for coverage, verification that the member had coverage for the service, and verification that the approved service was medically necessary.

112.    This letter was an In-Network Exception Agreement. More than just a verification of benefits, it formed a promise that Defendant Aetna would provide payment at the "in network benefit level" for the surgeries, which meant that the insured would not be liable for out-of-network patient cost-sharing amounts such as deductibles, co-payments, co-insurance, and the balance of the bill. By granting the in-network exception, Defendant promised the patient that they will be held only to their in-network cost sharing obligation and that they are "assuming" the obligation of the balance bill. Thus, Defendant effectively assumed responsibility for Plaintiffs' billed charges. By granting the in-network exception to the out-of-network provider Plaintiff, they are in essence contracting with him. It was also a representation that Defendant would provide such a benefit or assume any financial obligation above the patient's in-network obligation. **(See In Network Exception Agreement – Attached herein as Exhibit "D").**

113.    After Drs. Dreszer and Fletcher performed the two pre-authorized breast reconstruction and/or revision surgeries, Aetna breached the In-Network Exception Agreement.

The in-network benefit level Defendant both represented and promised precluded out-of-network patient cost-sharing requirements, including charges that exceeded the out-of-network fee schedule ("balance bill"). Instead, Defendant reimbursed Plaintiff based on what it said was the "maximum allowable" amount, for which it is usual and customary to receive payment-in-full or the maximum amount a plan will pay for a covered health care service for out-of-network providers. In-network providers, on the other hand, are paid based on a mutually negotiated contract rate between the insurance payor and the provider. Yet, Aetna reimbursed Plaintiff at unilaterally determined rates. In one Explanation of Benefit ("EOB") sent to Plaintiff, Aetna stated that its payment was based on a self-invented methodology it called "reasonable and appropriate." None of this constituted the value Defendant Aetna represented and promised, because the patient was left to pay the difference between the Plaintiff's charges and Aetna's "maximum allowable" amount.

### *Patient R.M.'s Surgery – May 25, 2018*

114.    On or about May 25, 2018, Patient R.M. presented to Plantation General Hospital for a pre-authorized implant exchange, related to Patient R.M.'s prior breast reconstruction following a mastectomy due to Patient R.M.'s diagnosis of right breast cancer.

115.    Defendant previously issued authorization for the Patient R.M.s mastectomy and breast reconstruction. Patient R.M.'s subsequent, medically necessary services on May 25, 2018 constitute continuity of care and are therefore covered under Defendant's prior authorization.

116.    On or about May 25, 2018, Plaintiff, through its physician, Dr. Fletcher, provided medical services to Patient R.M. at Plantation General Hospital, which consisted of implant exchange, all of which were covered benefits under Patient R.M.'s Plan ("Patient R.M. Surgery").

117.    While Dr. Fletcher was out-of-network at all material times, Defendant recognized that its network did not have in-network providers with the skill and experience to perform the

required procedure. Therefore, Aetna granted Plaintiff an in-network GAP exception for the May 25, 2018 procedure in a letter dated May 21, 2018.

118.    Upon information and belief, Vanguard's Drs. Dreszer and Fletcher are two of the only physicians in the geographic area who are qualified to perform this procedure at Plantation General Hospital. Plantation General Hospital is an in-network facility.

*Defendant's Underpayment of Patient R.M. Claims*

119.    Plaintiff submitted claims for reimbursement for the services Plaintiff provided to Patient R.M. as part of Patient R.M.'s Surgery ("Patient R.M. Claim").

120.    Plaintiff submitted Patient R.M.'s Claim to Defendant as the designated claims administrator responsible for adjudicating Patient R.M. Claim on behalf of Patient R.M.'s policy.

121.    Plaintiff's charges for the services it provided as part of Patient R.M.'s Surgery totaled $30,886.50, of which Aetna paid $9,592.58.

122.    Defendant paid Plaintiff a mere 3% of Plaintiff's charges for the services at issue, nowhere near the amount Defendant is required to pay to Plaintiff.

123.    Defendant issued the remittance notices of its foregoing underpayments on Patient R.M.'s. Claims to Plaintiff in Fort Lauderdale, Florida.

124.    Plaintiff never agreed to accept discounted rates from Defendant or to be bound by Defendant's reimbursement policies or rate schedules with respect to Patient R.M.'s. Claims.

125.    Upon information and belief, Defendant's course of dealing and course of performance with Plaintiff was to administer claims for services at the Patient R.M.'s in-network rate.

126.    Patient R.M. underwent previous surgeries related to the surgery at issue in this claim. These prior claims were paid at the in-network benefit level.[2] Accordingly, Patient R.M.'s Surgery at issue constituted a continuation of care and an in-network exception was granted by Aetna, therefore the claim must be reimbursed in the same manner as the previous claims.

127.    Defendant already adjudicated Patient R.M. Claims and determined they were for covered services under the Policy.

128.    Defendant has at all material times acknowledged and approved Plaintiff's rendering of the medical services underlying Patient R.M. Claims, including by pre authorizing Plaintiff's provision of services to Patient R.M., as corroborated through an In-Network Exception Agreement, and, upon information and belief, by authorizing Patient R.M.'s admission to Plantation General Hospital on or about May 25, 2018 and/or continued treatment of the Patient R.M.'s medical condition.

129.    Defendant was and is aware that Plaintiff provided medical services to Patient R.M. and billed Defendant for the medical services Plaintiff's physicians provided to Patient R.M. with the expectation and understanding that its services had been approved by Defendant and that it would be reimbursed by Defendant at rates reflecting the "in-network benefit level" including but not limited to 80% of the Fair Health rate, the billed charges/reasonable value in the marketplace, or *quantum meruit,* of the medical services Plaintiff provided.

130.    Plaintiff justifiably relied on the terms included in the In-Network Exception Agreement. The In-Network Exception Agreement was addressed to the Plaintiff, provided terms for payment and identified the specific physician and CPT codes which were the services in essence being contracted for.

---

[2] The claims numbers for these prior surgeries are ET352JNNY01 and ET352JNNY02.

131.    Additionally, Defendant's course of dealing and course of performance with Plaintiff was to administer claims for services based on 80% of the Fair Health rate when a payment amount could not be determined by the In-Network Exception Agreement. **(See attached letters establishing Defendant's course of conduct related to non-party patients – attached herein as Exhibit "B").**

132.    Plaintiff's course of dealing and course of performance with Defendant consistently demonstrates that Defendant pays Plaintiff 80% of the Fair Health amount for the CPT codes billed, particularly when their network does not include physicians with adequate experience or skill level to perform a medically necessary procedure. *Baker Cnty. Med. Servs. v. Aetna Health Mgmt., LLC,* 31 So. 3d 842,845–46 (Fla. 1st DCA 2010).

133.    Defendant in fact determined Plaintiff's medical services were covered services and paid Plaintiff for the medical services it provided to Patient R.M., albeit at rates inappropriately below Plaintiff's billed charges and the reasonable value in the marketplace.

134.    The rates at which Defendant paid Patient R.M. Claims are significantly less than the billed charges, the value or reasonable value of the services in the marketplace. Furthermore, the rates paid by Defendant for Patient L.B.'s claims are not reflective of the "in-network benefit level" including but not limited to 80% of the Fair Health rate promised by nature of entering into the In-Network Exception Agreement.

135.    Defendant's refusal to pay Plaintiff the billed charges and/or reasonable value of the medical services Plaintiff provided to Patient R.M. has caused Plaintiff to suffer damages in an amount equal to the difference between the amounts Defendant paid on Patient R.M. Claims and the reasonable value of the services Plaintiff provided, plus Plaintiff's loss of use of that money. The difference between the amounts Defendant paid and Plaintiff's billed charges totals **$21,293.92**.

136. All necessary conditions precedent for Defendant to perform its obligations pursuant to the applicable express contracts between the parties occurred or were performed, excused, and/or waived.

### D. *Patient R.S.*

137. Plaintiff provided medically necessary services to Patient R.S. consisting of emergency reconstructive surgery of Patient R.S.'s right hand stemming from a complex laceration of his right hand and partial amputation of his right finger. The surgery was performed on an emergency basis.

#### *Patient R.S.'s Surgery - January 11, 2019*

138. On or about January 11, 2019, Patient R.S. presented to the emergency department of Broward Health Medical Center for emergency treatment of his right hand.

139. Patient R.S. suffered a complex laceration to the right hand with partial amputation of his right long finger.

140. Plaintiff's physician, Dr. Fletcher, was the on-call specialist at the time and performed reconstructive surgery of Patient's right hand and finger.

141. The surgical procedures included revision of the amputation, repair of the complex laceration, local tissue rearrangement, irrigation and debridement of the wounds, and other procedures necessary to treat Patient R.S.

#### *Defendant's Underpayment of Patient R.S. Claims*

142. Plaintiff submitted claims for reimbursement for the services Plaintiff provided to Patient R.S. as part of Patient R.S.'s Surgeries (collectively, "Patient R.S. Claims").

143. Plaintiff submitted Patient R.S. Claims to Defendant as the designated claims administrator responsible for adjudicating Patient R.S. Claims on behalf of Patient's policy.

144.    Plaintiff's charges for the services it provided as part of the Patient R.S.'s Surgery totaled $14,693.00 for Dr. Fletcher, of which Aetna paid $1,655.69 for his services.

145.    Defendant paid Plaintiff a total of $1,655.69 on Patient R.S. Claims, which is a mere 11.3% of Plaintiff's charges for the services at issue and nowhere near the amount Defendant is required to pay to Plaintiff under Florida law.

146.    Defendant issued the remittance notices of its foregoing underpayments on Patient R.S. Claims to Plaintiff in Fort Lauderdale, Florida.

147.    Plaintiff never agreed to accept discounted rates from Defendant or to be bound by Defendant's reimbursement policies or rate schedules with respect to Patient R.S. Claims. Despite this, AETNA issued a misleading Explanation of Benefits for Plaintiff's Claims citing "the member's plan provides benefits for covered expenses at the reasonable charge for the service in the geographic area where it is provided" - yet AETNA did not cover expenses at a reasonable charge.

148.    Upon information and belief, Defendant's course of dealing and course of performance with Plaintiff was to administer claims for services provided as emergent care and/or inadvertent services, like Patient R.S. Claims for the services underlying Patient R.S.'s emergency Surgery, based on the billed charges and/or the reasonable value of the services.

149.    The amounts Defendant paid to Plaintiff for the services underlying Patient R.S. Claims for Patient R.S.'s Surgery does not correspond with the statutory language mandated under Florida law.

150.    Defendant already adjudicated Patient R.S.'s Claims and determined they were for covered services under the Policy.

151.    Defendant has at all material times acknowledged and approved Plaintiff's rendering of the medical services underlying Patient R.S. Claims, and upon information and belief, by authorizing Patient R.S's admission to Broward Health Medical Center's emergency department on or about January 11, 2019 for the treatment of Patient R.S's emergency medical conditions.

152.    Defendant was and is aware that Plaintiff provided medical services to Patient R.S. and billed Defendant for the medical services Plaintiff's physicians provided to Patient R.S. with the expectation and understanding that its services had been approved by Defendant and that it would be reimbursed by Defendant at rates reflecting (a) lesser of (i) Plaintiff's billed charges or (ii) the "usual and customary provider charges for similar services" (i.e., fair market value), as provided by Section 641.513(5), for claims subject to this section, and/or (b) the reasonable value in the marketplace, or *quantum meruit,* of the medical services Plaintiff provided, for claims determined to be not subject to Section 641.513(5).

153.    Defendant in fact determined Plaintiff's medical services were covered services and paid Plaintiff for the medical services it provided to Patient R.S., albeit at rates inappropriately below Plaintiff's billed charges, the fair market value, and/or the usual and customary rates for Plaintiff's services in the marketplace.

154.    The rates at which Defendant paid Patient R.S. Claims are significantly less than the rates required by Florida law. For claims covered by Section 641.513(5), Defendant has not paid Plaintiff the lesser of its billed charges or the fair market value of the services provided. For claims not covered by those sections, Defendant has not paid Plaintiff his billed charges and/or the reasonable value of the services in the marketplace.

155.     Defendant's refusal to pay Plaintiff the billed charges, fair market value and/or the reasonable value of the medical services Plaintiff provided to Patient R.S. has caused Plaintiff to suffer damages in an amount equal to the difference between the amounts Defendant paid on Patient R.S. Claims and the fair market value and reasonable value of the services Plaintiff provided, plus Plaintiff's loss of use of that money. The difference between the amounts Defendant paid and Plaintiff's billed charges totals **$13,037.11.**

156.     All necessary conditions precedent for Defendant to perform its obligations pursuant to Section 641.513(5) and/or the applicable express or implied contracts between the parties occurred or were performed, excused, and/or waived.

**COUNT I**
**Breach of Contract**
***(As to Patients L.B., B.H. and R.M.)***

157.     Plaintiff repeats and realleges each preceding allegation of this Complaint as if set forth at length herein.

158.     Defendant entered into In-Network Exception Agreements with Plaintiff governing surgical procedures performed by Plaintiff on Patients L.B.[3], B.H.[4] and R.M.[5].

159.     The In-Network Exception Agreements set forth the terms of the Parties' contract for services, specifically, the physician to perform the procedure, the specific medical services to be covered by Defendant, how Aetna would determine the amount to be paid, and dates within which their offer for payment was valid. Plaintiff accepted these terms and reasonably relied on them in rendering services to Patients L.B., B.H. and R.M.

160.     Thus, the parties entered into valid contracts.

---

[3] Patient L.B. Contract was expressed in a letter dated February 2, 2021.
[4] Patient B.H. Contract was expressed in a letter dated March 14, 2019.
[5] Patient R.M. Contact was expressed in a letter dated May 21, 2018

161.    The In-Network Exception Agreement stated: "Approved at the in-network benefit level...The member will be responsible only for in-network cost-sharing requirements." Accordingly, Defendant assumed the responsibility of paying the balance of the Plaintiff's billed charges.

162.    When a specific pricing cannot be determined by the In-Network Exception Agreement, course of dealing and performance reflects that Defendant pays 80% of the Fair Health rate for the CPT codes billed.

163.    After receiving the contract, Plaintiff performed Patients' L.B., B.H., R.M. surgeries referenced in each respective In- Network Exception Agreement.

164.    Defendant failed to perform its obligations under the In-Network Exception Agreements in that Plaintiff was paid less than the "in-network benefit level", less than 80% of the Fair Health rate and less than the billed charges and/or reasonable value of Plaintiff's services, when an in-network benefit level was not applicable.

165.    Additionally, Defendant failed to perform its obligation under the In-Network Exception Agreements in that the member was responsible for more than in-network cost-sharing requirements, and Plaintiff was not paid the balance of their billed charges assumed by Defendant.

166.    As a result of Defendant's breach, Plaintiff sustained damages as follows:

a. Patient L.B. - $702,346.33
b. Patient B.H. - $632,390. 42
c. Patient R.M. - $21,293.92

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendant and in favor of Plaintiff in an amount representing the difference between the amounts Defendant paid to Plaintiff for the medical services at issue and the billed charges and/or reasonable value of those services in the marketplace, as determined by the finder of fact, together with an award of

prejudgment interest, costs, and such other and further relief as the Court may deem just and proper.

## COUNT II
## Breach of Implied-in-Fact Contract - Fair Market Value
### *(As to Patient R.S.)*

167.    Plaintiff repeats and realleges each preceding allegation of this Complaint as if set forth at length herein.

168.    At all material times, Defendant knew or should have known that Plaintiff was an out-of-network medical provider that provided medical services and staffing at Plantation General Hospital.

169.    At all material times, Defendant knew or should have known that Plaintiff is obligated by law to provide emergency services and care to Defendant's members, including Patient R.S., and that Defendant is obligated by law to cover those services.

170.    At all material times, Defendant is obligated to cover and pay for medical services Patient R.S. received at Plantation General Hospital and Broward Health Medical Center, respectively.

171.    At all material times, Defendant is aware of its obligation to non--contracted providers like Plaintiff and was aware that Plaintiff provided medical services to Patient R.S with the reasonable expectation and understanding that Plaintiff would be reimbursed by Defendant at rates, under *quantum meruit,* reflecting the reasonable value of its services in the marketplace.

172.    A contract implied-in-fact was doubtless established through Defendant's knowledge that services were being rendered and both sides intended for compensation to be paid, with the parties possessing the compensation intention through the course of their past dealings or otherwise.

173.    At all material times, Defendant knew that Plaintiff had not agreed to accept discounted rates from Defendant for Patient R.S.'s Claims and had not agreed to be bound by Defendant's reimbursement policies or rate schedules.

174.    With full knowledge of their obligations and the surrounding circumstances as described in detail above, Defendant, as it pertains to Patient R.S.:

    a.   approved of Patient R.S. presenting to Broward Health Medical Center's emergency department in Ft. Lauderdale, Florida, on the dates listed above;

    b.   approved of Plaintiff providing medical services to Patient R.S. as part of Patient R.S.'s surgery; and

    c.   impliedly agreed to pay Plaintiff the reasonable value in the marketplace for those medical services.

175.    Plaintiff submitted Patient R.S.'s Claims seeking reimbursement at rates representing the reasonable value of the services rendered.

176.    Plaintiff submitted Patient R.S.'s Claims to Defendant as the designated administrator responsible for adjudicating Patient R.S.'s Claims on behalf of Patient R.S.'s Plan.

177.    Defendant acknowledged its obligation and responsibility for payment and their approval of Plaintiff performing medical services as part of Patient R.S.'s Surgeries by paying some of Plaintiff's claims for those services, albeit at a rate far below that to which Plaintiff is entitled.

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendant and in favor of Plaintiff in an amount representing the difference between the amounts Defendant paid to Plaintiff for the medical services at issue and the billed charges and/or reasonable value of those services in the marketplace, as determined by the finder of fact, together with an award of prejudgment interest, costs, and such other and further relief as the Court may deem just and proper.

## COUNT III
### Breach of Implied-in-Fact Contract – Fair Market Value
*(In the alternative, as to Patients L.B., B.H. and R.M.)*

178. Plaintiff repeats and realleges each preceding allegation of this Complaint as if set forth at length herein.

179. At all material times, Defendant knew or should have known that Plaintiff was an out-of-network medical provider that provided medical services and staffing at Plantation General Hospital, as acknowledged in the In-Network Exception Agreement.

180. At all material times, Defendant knew or should have known that Plaintiff provided the pre-authorized, medically necessary services, and that Defendant is obligated to cover those services.

181. At all material times, Defendant is obligated to cover and pay for medical services Patients L.B., B.H. and R.M. received at Plantation General Hospital.

182. At all material times, Defendant is aware of its obligation to non-contracted providers like Plaintiff and was aware that Plaintiff provided medical services to Patients L.B., B.H. and R.M. with the reasonable expectation and understanding that Plaintiff would be

reimbursed by Defendant at rates, under *quantum meruit,* reflecting the reasonable value of its services in the marketplace.

183.   A contract implied-in-fact was doubtless established through Defendant's knowledge that services were being rendered and both sides intended for compensation to be paid, with the parties possessing the compensation intention through the course of their past dealings or otherwise.

184.   At all material times, Defendant knew that Plaintiff had not agreed to accept discounted rates from Defendant for Patients L.B., B.H. and R.M.'s Claims and had not agreed to be bound by Defendant's reimbursement policies or rate schedules.

185.   With full knowledge of their obligations and the surrounding circumstances as described in detail above, Defendant, as it pertains to Patients L.B., B.H. and R.M.:

   a.   approved of Patients L.B., B.H. and R.M. presenting to Plantation General Hospital in Plantation, Florida, on the dates incorporated above;

   b.   approved of Plaintiff providing medical services to Patients L.B., B.H. and R.M. as part of Patients L.B., B.H. and R.M.'s surgery; and

   c.   impliedly agreed to pay Plaintiff at an "in-network benefit level" or the reasonable value in the marketplace for those medical services in the "in-network benefit level" could not be determined.

186.   Plaintiff submitted Patients L.B., B.H. and R.M.'s Claims seeking reimbursement at rates representing the reasonable value of the services rendered.

187.   Plaintiff submitted Patients L.B., B.H. and R.M.'s Claims to Defendant as the designated administrator responsible for adjudicating Patients L.B., B.H. and R.M.'s Claims on behalf of Patients L.B., B.H. and R.M.'s Plan.

188.    Defendant acknowledged its obligation and responsibility for payment and their approval of Plaintiff performing medical services as part of Patients L.B., B.H. and R.M.'s Surgeries by paying some of Plaintiff's claims for those services, albeit at a rate far below that to which Plaintiff is entitled.

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendant and in favor of Plaintiff in an amount representing the difference between the amounts Defendant paid to Plaintiff for the medical services at issue and the billed charges and/or reasonable value of those services in the marketplace, as determined by the finder of fact, together with an award of prejudgment interest, costs, and such other and further relief as the Court may deem just and proper.

## COUNT IV
### Breach of the Warranty of Good Faith and Fair Dealing
#### *(As to Patients L.B., B.H., R.M., R.S.)*

189.    Plaintiff repeats and realleges each preceding allegation of this Amended Complaint as if set forth at length herein.

190.    The law implies in every contractual relationship, including that between Plaintiff and Defendant here, a warranty of good faith and fair dealing, which requires each party to the agreement to act in a manner that is consistent with the other party's reasonable expectations.

191.    Defendant violated the implied warranty of good faith and fair dealing with respect to its contracts and implied contracts with Plaintiff through acts of misdirection, provision of misinformation, refusal to uphold the basic terms which it set, and generally engaging in unjustified wrongful conduct upon performance.

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendant and in favor of Plaintiff in an amount representing the difference between the amounts Defendant paid to

Plaintiff for the medical services at issue and the billed charges and/or reasonable value of those services in the marketplace, as determined by the finder of fact, together with an award of prejudgment interest, costs, and such other and further relief as the Court may deem just and proper.

## COUNT V
### Negligent Misrepresentation
#### *(As to Patients L.B., B.H., R.M., R.S.)*

192.     Plaintiff repeats and realleges each preceding allegation of this Complaint as if set forth at length herein.

193.     Through Defendant's representations to Plaintiff regarding the amount that it would pay to Plaintiff for services performed on Patients L.B., B.H., R.M., and R.S. (collectively "Patients"), Aetna provided information to Plaintiff in the course of its business or in the course of a transaction that Defendant had a pecuniary interest.

194.     Defendant's representations to Plaintiff regarding authorization and payment for services relative to insured Patients were false, as exhibited by the In-Network Exception Agreement.

195.     Defendant did not exercise reasonable care or competence in obtaining or communicating the information to Plaintiff.

196.     Plaintiff justifiably relied upon Defendant's representations and performed services on Patients based on the same.

197.     As a direct and proximate result of Defendant's misrepresentations to Plaintiff regarding authorization and payment for services relative to insured Patients, Plaintiff has sustained damages.

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendant and in favor of Plaintiff in an amount representing the difference between the amounts Defendant paid to Plaintiff for the medical services at issue and the billed charges and/or reasonable value of those services in the marketplace, as determined by the finder of fact, together with an award of prejudgment interest, costs, and such other and further relief as the Court may deem just and proper.

**COUNT VI**
**Promissory Estoppel**
*(In the alternative, as to Patients L.B., B.H., R.M., and R.S.)*

198.    Plaintiff repeats and realleges each preceding allegation of this Amended Complaint as if set forth at length herein.

199.    Defendant's representations prior to the performance of the services, regarding the amount that it would pay to Plaintiff for services performed on L.B., B.H., R.M., and R.S. (collectively "Patients"), represented a promise.

200.    Defendant knew or should have known that Plaintiff would rely upon Defendant's promise to pay Plaintiff for services performed on Patients.

201.    Plaintiff substantially and justifiably relied upon said promises and performed services on Patients based on this reliance.

202.    Defendant's actions therefore caused Plaintiff to suffer a detriment of definite and substantial nature in reliance on the promises made by Defendant that it would pay the amount that it represented for the authorized services performed on Patients.

203.    As a direct and proximate result of Defendant's failure to fulfill its promise to pay at an "in-network benefit level" including but not limited to the "usual and customary rates" for the pre-authorized surgical services provided by Plaintiff to Patients, Plaintiff has been damaged.

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendant and in favor of Plaintiff in an amount representing the difference between the amounts Defendant paid to Plaintiff for the medical services at issue and the billed charges and/or reasonable value of those services in the marketplace, as determined by the finder of fact, together with an award of prejudgment interest, costs, and such other and further relief as the Court may deem just and proper.

**COUNT VII**
**Violation of Section 641.513(5)- Emergency Services**
**_(L.B.'s Third Surgery - February 12, 2021)_**

204.    Plaintiff repeats and realleges each preceding allegation of this Amended Complaint as if set forth at length herein.

205.    Section 641.513(5) imposes a duty on Defendant, as a managed care organization to reimburse Plaintiff for Patient L.B.'s Emergency Claims according to the statutes' dictates.

206.    Pursuant to Section 641.513(5), reimbursement for services pursuant to this section by a provider who does not have a contract with the health maintenance organization shall be the lesser of:

(a) The provider's charges;

(b) The usual and customary provider charges for similar services in the community where the services were provided; or

(c) The charge mutually agreed to by the health maintenance organization and the provider within 60 days of the submittal of the claim.

Such reimbursement shall be net of any applicable copayment authorized pursuant to subsection (4). F.S. 641.513(5).

207.    Plaintiff has a private right of action under Section 641.513(5) to enforce the statutes' provisions against Defendant.

208.    At all material times, Plaintiff was a non-participating emergency medical provider that staffed the emergency department at Plantation General Hospital.

209.     The medical services Plaintiff provided to Patient L.B. as part of her Emergency Third Surgery were emergency services and care as defined in Section 641.47(8), Florida Statutes and/or were a continuation of care stemming from covered non-emergency services and/or inadvertent services, rendered to Patient L.B. at Plantation General Hospital on February 10, 2021.

210.    Plaintiff submitted the Patient L.B. Claims for the emergency services it provided to Patient L.B. ("Patient L.B. Emergency Claims"), which were subject to Section 641.513(5), to Defendant.

211.     Defendant, as a managed care organization licensed and/or operating in the state of Florida, was responsible for payment of the Patient L.B. Emergency Claims.

212.    Patient L.B. Emergency Claims set forth Plaintiff's billed charges for the emergency services it provided to Patient L.B. on February 12, 2021.

213.    Defendant determined the Patient L.B. Emergency Claims was a covered emergency service.

214.     Plaintiff and Defendant did not mutually agree on a specific charge for any of the Patient L.B. Emergency Claims. Plaintiff did not agree to accept discounted rates from Defendant for Patient L.B. Emergency Claims, nor did it agree to be bound by Defendant's reimbursement policies or rate schedules with respect to Patient L.B. Emergency Claims.

215.     Defendant violated Section 641.513(5) by failing to pay Plaintiff the "usual and customary provider charges for similar services in the community where the services were provided" for the Patient L.B. Emergency Claims.

216.     As a result of Defendant's failure to fulfill its legal obligations to reimburse Plaintiff in accordance with Section 641.513(5), Plaintiff has suffered injury and is entitled to monetary damages from Defendant.

217.     Plaintiff seeks compensatory damages, as permitted by applicable law, in an amount equal to the difference between the amounts Defendant paid to Plaintiff for the Patient L.B. Emergency Claims and the fair market value of the medical services underlying the Patient L.B. Emergency Claims, plus interest.

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendant and in favor of Plaintiff in an amount representing the difference between the amounts Defendant paid to Plaintiff for the Patient L.B. Emergency Claims and the fair market value of the medical services underlying  Patient L.B. Emergency Claims, as determined by the finder of fact, together with an award of prejudgment interest, costs, and such other and further relief as the Court may deem just and proper.

## COUNT VIII
### Violation of Section 641.513(5)- Emergency Services
### *(R.S.'s Surgery - January 11, 2019)*

218.     Plaintiff repeats and realleges each preceding allegation of this Amended Complaint as if set forth at length herein.

219.     Section 641.513(5) imposes a duty on Defendant, as a managed care organization to reimburse Plaintiff for Patient R.S. Emergency Claims according to the statutes' dictates.

220.    Pursuant to Section 641.513(5), reimbursement for services pursuant to this section by a provider who does not have a contract with the health maintenance organization shall be the lesser of:

(a) The provider's charges;

(b) The usual and customary provider charges for similar services in the community where the services were provided; or

(c) The charge mutually agreed to by the health maintenance organization and the provider within 60 days of the submittal of the claim.

Such reimbursement shall be net of any applicable copayment authorized pursuant to subsection (4). F.S. 641.513(5).

221.    Plaintiff has a private right of action under Section 641.513(5) to enforce the statutes' provisions against Defendant.

222.    At all material times, Plaintiff was a non-participating emergency medical provider that staffed the emergency department at Broward Health Medical Center.

223.    The medical services Plaintiff provided to Patient R.S. as part of his surgery were emergency services and care as defined in Section 641.47(8), Florida Statutes and/or inadvertent services.

224.    Plaintiff submitted the Patient R.S. Claims for the emergency services it provided to Patient R.S. ("Patient R.S. Emergency Claims"), which were subject to Section 641.513(5), to Defendant.

225.    Defendant, as a managed care organization licensed and/or operating in the state of Florida, was responsible for payment of the Patient R.S. Emergency Claims.

226.    Patient R.S. Emergency Claims set forth Plaintiff's billed charges for the emergency services it provided to Patient R.S. on January 11, 2019.

227.    Defendant determined the Patient R.S. Emergency Claims was a covered emergency service.

228.    Plaintiff and Defendant did not mutually agree on a specific charge for any of the Patient R.S. Emergency Claims. Plaintiff did not agree to accept discounted rates from Defendant for Patient R.S. Emergency Claims, nor did it agree to be bound by Defendant's reimbursement policies or rate schedules with respect to Patient R.S. Emergency Claims.

229.    Defendant violated Section 641.513(5) by failing to pay Plaintiff the "usual and customary provider charges for similar services in the community where the services were provided" for the Patient R.S. Emergency Claims.

230.    As a result of Defendant's failure to fulfill its legal obligations to reimburse Plaintiff in accordance with Section 641.513(5), Plaintiff has suffered injury and is entitled to monetary damages from Defendant.

231.    Plaintiff seeks compensatory damages, as permitted by applicable law, in an amount equal to the difference between the amounts Defendant paid to Plaintiff for the Patient R.S. Emergency Claims and the fair market value of the medical services underlying the Patient R.S. Emergency Claims, plus interest.

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendant and in favor of Plaintiff in an amount representing the difference between the amounts Defendant paid to Plaintiff for the Patient R.S. Emergency Claims and the fair market value of the medical services underlying  Patient R.S. Emergency Claims, as determined by the finder of fact, together with an

award of prejudgment interest, costs, and such other and further relief as the Court may deem just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff demands a trial by jury of all issues so triable.

DATED this <u>4th</u> day of October, 2022.


Respectfully submitted,

**DI PIETRO PARTNERS, PLLC**
901 East Las Olas Blvd, Suite 202
Fort Lauderdale, FL 33301
Primary Email Address:
service@ddpalaw.com
Secondary Email Address:
nicole@ddpalaw.com
Telephone: (954) 712-3070
Facsimile: (954) 337-3824

<u>*/s/ Nicole Martell*</u>
NICOLE MARTELL, ESQ.
Florida Bar No.: 100172
nicole@ddpalaw.com